See the preceding case.

---

## Cummings et al., Appellants, v. Glass.

[Marked to be reported.]

*Deed—Delivery—Possession—Evidence.*

Where a deed for real estate has been duly executed and acknowledged
and a receipt thereon for the purchase money duly signed, and both the
grantor and grantee are dead, and there is evidence sufficient to submit to
the jury of the delivery of the deed, the question of delivery is for the
jury, there being nothing in the possession of the premises inconsistent
with the passing of the title by the delivery of the deed.

The evidence in this case was to the effect that after the grantee's death
his daughter took possession of his papers which she kept in a box; that
a witness afterwards saw the deed therein wrapped in a brown paper with
a rubber band around it; that the daughter when she was about to die
asked the grantor to look after all the papers and the business of the fam-
ily; that a brown package of papers with a rubber band around it was
taken from the box and given to the grantor, and that after the grantor's
death the deed was found in a safe used in common by the grantor and
the family of the grantee.   *Held*, that this evidence was sufficient to estab-
lish a delivery of the deed.

Argued Feb. 7, 1894.   Appeal, No. 180, July T., 1893, by
plaintiffs, Thomas Cummings and Clara C. Barrington, from
judgment of C. P. Delaware Co., June T., 1891, No. 149, on
verdict for defendant, Elizabeth M. Glass.   Before STER-
RETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ.   Affirmed.

Ejectment for undivided two fifths of property, known as "Sea Drift," at Linwood. Before CLAYTON, P. J.

On the trial, it appeared that plaintiffs 'claimed as residuary devisees of A. Boyd Cummings, deceased; and defendant claimed under a deed from Cummings to Alexander F. Glass, her deceased husband. Cummings was a bachelor and lived with the Glass family, first at a hotel kept by Glass, and afterwards in private houses. Glass died in 1881, and Mr. Cummings continued to reside with Mrs. Glass and her family until his death in 1891. The deed under which defendant claimed was unrecorded. Mr. Cummings purchased the premises in question in 1864, and the family of Glass, accompanied by Mr. Cummings, made it their summer home. The evidence of delivery of the deed is given in the opinion of the Supreme Court.

Kate Ubil, a witness for the defendant, testified, under objection, that Mrs. Glass was always at the head of the household at Linwood, and that the household expenses there were paid by Mrs. Glass and Mrs. Buehler, all of them together. [2]

Mary Cummings, defendant's witness, testified, under objection and exception, that Mr. Cummings said to her that he would live with Mrs. Glass and her family as long as he lived, to do whatever he could for them. [5]

William H. Priest, defendant's witness, testified, under objection and exception, that in 1867 or 1868 part of the property was put in grain by him for Mr. Glass on shares. [6]

Defendant, under objection and exception, gave in evidence Cummings's check books, showing payment of board to Mrs. Glass and interest on a $5,000 note. [1]

Evidence was also given by defendant, under objection and exception, that $5,000 worth of bonds registered in the name of Alexander F. Glass were found among Cummings's papers after his death. [9]

The court charged in part as follows :

" The case now about being submitted to you is by no means a clear one. The evidence is somewhat conflicting, and not entirely satisfactory. Whatever difficulties you may encounter you will have to overcome as best you can, but the case is to be decided according to the weight of the evidence. It is not to be decided by guess work or by any sympathy you may have in the cause. You are to decide it by the evidence.

" It appears that Mr. Cummings at one time, many years ago, purchased this Linwood property. For some reason he did not record his deed, and about two years after the purchase he made a deed for it regular in form to Mr. Glass, and the single question around which all the testimony in the case and all the evidence that has been offered must center is: Was that deed ever delivered? The deed, I say, was regular in form, written upon parchment, signed and sealed; but however regular a deed may be in form, in law it is not a deed until it is delivered; whenever it is delivered the title passes, and the destruction of the deed after that will not revest the title. The fact that a deed that has been once delivered comes back to the possession of the grantor, will not reconvey the title to the grantor; it must be by deed, by will, or by descent that it comes back.

" The only two persons that could explain the mysteries surrounding this deed to your satisfaction are dead; perhaps, a few words from Mr. Cummings or from Mr. Glass would make all the difficulty perfectly clear. Their mouths are sealed; they cannot speak; but Mr. Cummings has left a deed behind him, which does speak; and if it ever was delivered, the language is unmistakable ; it conveys the title as therein described. I suppose you will certainly conclude that when that deed was made it explains just what was intended to be explained; it could not have been made for the mere pleasure of writing it and preserving it; it was made for a purpose. [If you are satisfied that Mr. Cummings knew of the existence of the deed, you would be safe in arriving at the conclusion that he had some object in preserving it; an object in making it and an object in preserving it. What that object was does not clearly appear.] [11]

" Now, gentlemen, as I stated, a moment ago, the whole question, the important question, the question around which all this testimony centers is, was this deed ever delivered?

" The delivery of a deed means either handing it to the grantee, recording it, or leaving it with some person for him, or leaving it where he can get it. To sign, seal and execute a deed and throw it upon a table where the grantee can pick it up is a delivery. There is no particular form of delivery. The deed must pass from the control of the man who makes it and

be in such a position as to be in the control of the man to whom it is made, and that is a delivery.

" The plaintiff here claims as residuary legatee under the will of Mr. Cummings.  The defendant claims this property under this disputed deed.  If, gentlemen, you come to the conclusion, giving due weight to all the testimony, that Mr. Cummings, during the lifetime of Mr. Glass, either gave that deed to him or gave it to somebody for him, then the mere fact that the deed afterwards came back into his possession would not be sufficient to revest the title.  [If you come to the conclusion that there was some condition connected with the delivery of this deed, and that it was never delivered to Mr. Glass personally, but that it was delivered to his daughter, Mrs. Buehler, as an escrow, still, if that condition was complied with, the title would pass.  We don't know what the condition was.  It might have been that it was not to be delivered until after his death; it may be that it was never to be delivered.  We don't know.] [12] But as I said a moment ago, the deed itself is strong evidence in the cause.  [The great question will be, was the deed delivered during the lifetime of Mr. Glass, as testified to by Miss Ubil,] [13] [and if you should come to the conclusion that it was not properly delivered then, then the next great question will be, did Mr. Cummings, when he came to die, knowing that that deed was in existence, did he put it in that fire-proof with the intention well defined of absolutely parting with its custody, of never taking it himself again, and of placing it there so that Mrs. Glass could get it, with the intention that she should get it and with the intention that it should pass title to her.] [14] [That is the second question.  If you should come to the conclusion that he did, that he put it in that fire-proof in her house with the intention that she should find it, knowing that she had the key, and that she should take possession of it, that would be a sufficient delivery.] " [15]

Plaintiffs' points were among others as follows :

" 2. Payment of the consideration money in a deed of bargain and sale is necessary to transfer the use and to render the deed operative.  The burden of showing payment of the consideration is, in this case, on the defendant, and she has offered no evidence to show that the consideration was ever paid.  *Answer :* I cannot affirm that point, gentlemen, as written.

The receipt of the deed is some evidence, not conclusive, but some evidence. The evidence, however, of the payment of this consideration is very meager and very unsatisfactory; but if the deed was delivered, that makes no difference. The title would pass without the payment of the consideration. If the deed was delivered with the receipt for the consideration money upon it, the consideration would have to be recovered in another form of action, but the title would pass. I, therefore, say, if the deed was delivered, I decline to affirm this point. If the deed never was delivered the point as presented is affirmed." [16]

" 5. Under the evidence in this case a gift of the land in question to be effectual must be shown to have been executed in the lifetime of both A. Boyd Cummings and Alexander F. Glass by the delivery of the deed. *Answer :* I decline to so charge you. I charge you that a delivery to his devisee after Mr. Glass's death with an intention to pass the title would be good, and would pass the title to Mrs. Glass, if Mr. Cummings so intended when he delivered it." [17]

" 9. Even if the jury find that the fire-proof at 910 Pine street was used in common by Mr. Cummings and Mrs. Glass, the mere placing of the deed therein by Mr. Cummings would not amount to a delivery of the deed ; if the safe was used by Mr. Cummings for his own property at all, no presumption that he intended to give any property to Mrs. Glass could possibly arise from his merely placing it there, just as no presumption could arise that Mrs. Glass intended to give to Mr. Cummings a jewel, a bond, or a roll of money if she had happened to leave such an article in the safe. *Answer :* Well, gentlemen, this point is rather argumentative ; if Mrs. Glass had put a roll of money, a piece of jewelry, or any other piece of her property in an envelope and indorsed it ' for Mr. Cummings ' and put it in the fire-proof, where they both had access, it would be some evidence that she intended to give it to him ; that it was his ; so, if a deed was put in this fire-proof in her name or her husband's name, her devisor's name, it might be some evidence of an intention that she would get it ; it certainly is some evidence— it would not be conclusive evidence ; I affirm, therefore, this point, unless you find from all the evidence an intention on the part of Mr. Cummings to deliver the deed by that act ; if you

find his purpose in placing this deed in the fire-proof, to which both had a key and to which both had access, was that it should come to her hands, that would be a sufficient delivery, but there must be evidence of the intention; it may be gathered from all the evidence in the case, you may find from the very fact that she had a key to the fire-proof, and that the deed was in her husband's name, and she was the devisee of her husband, and the other evidence in the case, you may find that such was his intention; I say the evidence is at best but slight." [18]

" 10. The bequest of the fire-proof by Mr. Cummings to Mrs. Glass, with the rest of the furniture of the Pine street house, can have no bearing on the question of his delivery of the deed; the bequest of the fire-proof did not carry the contents, and in any event it would not take effect till after Mr. Cummings's death, at which time it was too late for any delivery of the deed to be effected. *Answer :* He could not certainly deliver the deed after he was dead, and unless you find he put it there for the purpose of losing all control over it and for the purpose of putting it under her power and control, the point is affirmed, but if you find his object in putting it there was to part with his possession of that deed and to put it where she could get it, it being a deed to her husband, and she being her husband's devisee, it has some bearing upon the point of delivery. I cannot see that it has any bearing upon any other question." [19]

" 11. Even if the jury believe the testimony of Miss Catharine Ubil, that Mr. Cummings received a package of papers from Mrs. Buehler at the time the latter was dying, they cannot infer that the deed in question, nor in fact any of the Linwood title papers, were in the package, for this would be mere guess work. *Answer :* That part of this point I cannot affirm. The question will be for the jury. My recollection of Miss Ubil's testimony is that the envelope that contained these title papers in her judgment and belief is the same that she saw delivered to Mr. Cummings, and I think she said she saw the same envelope afterwards in the fire-proof; but that I am not sure of; you will remember. There is, therefore, some evidence that this deed might have been in that package, but, of course, the weight of that evidence is entirely for you."

The balance of the point was as follows :

" The burden is upon the party offering this proof to show positively what papers Mr. Cummings so received, and in the absence of any such evidence it would be wholly unjustifiable for the jury to draw any inference unfavorable to Mr. Cummings's ownership of the property from any word or act of his or his omission to speak at this time, for the obvious reason that such inference would be predicated upon the facts that not only was the deed in question in the package, but that Mr. Cummings knew it, of neither of which is there a particle of proof. *Answer* : I can't say, gentlemen, that there is not a particle of proof. I leave the question with you. You have heard Miss Ubil's testimony, and if you come to the conclusion that the package of papers which was delivered by the dying woman to Mr. Cummings contained this deed, it would be some evidence that there had been a previous delivery. Then the fact that it came back to Mr. Cummings's possession would not revest the title. If he ever delivered that deed, nothing would revest the title in him but another conveyance or some lawful devise." [20]

" 14. Placing an undelivered voluntary deed in such a place that it may fall into the hands of the grantee, or his heirs, or his devisees after the grantor's death, would not pass the title. If the alleged grantor retains the title and the full dominion over the property till the end of his life, it falls upon his heirs or the devisees named in his will at the moment of his death, no matter what intention he may have had to the contrary. *Answer* : Well, gentlemen, I will affirm that point; unless the placing of the deed in such a place was in fact that he intended it to fall into the hands of the grantee it would be a delivery, but if he did not so intend it, it would not be." [21]

" 18. There is no evidence of a delivery in escrow, and such a delivery cannot be presumed in the absence of evidence. *Answer* : I decline to affirm that point. But I say to you that there is very little evidence of a delivery in escrow. I should describe to you what an escrow is. It is where a man makes a deed and hands it to another to be delivered to the grantee upon the performance of some condition ; that is a delivery in escrow. The title is held, it is suspended ; when the condition is performed the title reverts back to the date of the deed. There is very little evidence here of a delivery in escrow. We don't know what the delivery to Glass was, nor that there ever

was one. A delivery to him would not be an escrow. If it was delivered to Mrs. Buehler, and there was some understanding as to when it should be delivered, and that it should not be delivered until after his death, or some other event, that would be a delivery in escrow. But I say the evidence is very slight, indeed, as to a delivery in escrow. That is all, I think, necessary to say upon that subject. I will not say there is no evidence of a delivery in escrow." [22]

" 19. Delivery of a deed is generally a question for the jury, but, when, as in this case, there is no sufficient evidence upon which a delivery can be inferred, it is the duty of the court to take the question from the jury, and you are accordingly directed to find a verdict for the plaintiffs for the undivided two fifths of the land, which they claim. *Answer:* I decline to so charge you. The question is for you." [23]

" 20. Under all the evidence, your verdict must be for the plaintiffs for the two fifths of the land. *Answer:* I decline to so charge you. I say, under all the evidence, you may find either for the plaintiffs or for the defendant. If you are satisfied, under all the evidence, that there was a delivery to Mr. Glass in his lifetime ; if you are satisfied, under all the evidence, that there was a delivery to Mrs. Buehler for the benefit of Mr. Glass's heirs or for the benefit of Mr. Glass's devisee, his widow, or if you are satisfied that Mr. Cummings put the deed in the fire-proof for the purpose of parting with all control over it, and with the intention that Mrs. Glass should get it, you may find for the defendant. If you are not satisfied upon these points, and do not believe from the evidence that there ever was a delivery to Mr. Glass or Mrs. Buehler, or that the deed was not put in the fire-proof for the purpose of a delivery to Mrs. Glass, then your verdict should be for the plaintiffs for two undivided fifths." [24]

Defendant's points were among others as follows :

" 2. If the jury are satisfied from the evidence of Kate Ubil that the deed in question was in the possession of Mrs. Buehler, the daughter of Alexander F. Glass, in 1881 or 1882, after the death of Mr. Glass, and that Mrs. Buehler was the custodian of the papers of her deceased father, they may find that the deed was delivered to Mr. Glass by Mr. Cummings prior to the death of Mr. Glass, or delivered by Mr. Cummings to

Mrs. Glass or Mrs. Buehler for her after the death of Mr. Glass, and in either event their verdict should be for the defendant. *Answer:* That point is affirmed if you find the facts as therein stated." [25]

"4. If the jury are satisfied from the evidence of John Baird that Mr. Cummings, in arranging his affairs shortly before his death, placed the deed in the safe at the residence of Mrs. Glass, so that it would come to her hands after his death, this would be a sufficient delivery in law, and their verdict should be for the defendant. *Answer:* Gentlemen, if from all the evidence the jury are satisfied that Mr. Cummings placed this deed in the fire-proof in Mrs. Glass's house, knowing that she had a key and had the common use of the safe; and if he absolutely intended then to part with all control over the deed and thereby to deliver it, this would be a sufficient delivery in law, and this point would be affirmed. I may express some doubt whether a delivery after his death or placing it in the fire-proof, if his intention was that she should not have it until after his death, would be sufficient; I must express some doubt on that subject; but if he put it in the fire-proof, never intending to take the deed back, if he intended that she should open the fire-proof the next day, and she should take it, that would be a good delivery. If his intention was that the title should not pass until after his death, I am not prepared to say the title would not pass by such a delivery; but for the purpose of this case I must decline to affirm that proposition." [26]

The jury having come back, requested further instructions on the following question : " Q. If the jury find from the evidence that the deed was in the hands of Miss Ubil during the life of Mrs. Buehler, is that to be considered a delivery of the deed to the Glass family ? *Answer:* That is evidence of the delivery of the deed to the Glass family, and unexplained it would be sufficient, but the whole evidence is to be considered by you. If there is any other evidence in the case that would tend to explain that delivery, you may consider it." [27]

*Errors assigned* were, (3, 4, 7, 8, 10) rulings on evidence stated in opinion of Supreme Court; (1, 2, 5, 6, 9) above rulings on evidence ; (11–27) instructions in brackets ; quoting bills of exceptions, evidence and instructions.

*Robert H. Neilson, V. Gilpin Robinson* with him, for appellants.—The testimony objected to was irrelevant and immaterial and its admission therefore error: Cummings's Est., 153 Pa. 397; Hill v. Meyers, 43 Pa. 170; Foster v. Shaw, 7 L. J. R. 156; Harper v. Jeffries, 5 Whart. 26; Brobst v. Welker, 8 Pa. 467; Featherman v. Miller, 45 Pa. 96; Rouch v. Zehring, 59 Pa. 74; Whitney v. Moore, 77 Pa. 479; R. R. v. Decker, 78 Pa. 293; Cummings v. Williamsport, 84 Pa. 472; Weidler v. Bank, 11 L. J. R. 134; Bank v. Dunn, 6 Pet. 51; Henderson v. Anderson, 3 How. 73; Saltmarsh v. Tuthill, 13 How. 229; U. S. v. Leffler, 11 Pet. 86; Gaul v. Willis, 26 Pa. 259; Bratton v. Mitchell, 3 Pa. 44; Velott v. Lewis, 102 Pa. 326.

On the question of delivery, see Dayton v. Newman, 19 Pa. 199; Eckman v. Eckman, 55 Pa. 269; Chandler v. Temple, 4 Cush. 285; Ins. Co. v. Cole, 4 Fla. 359–373; Green v. Yarnall, 6 Mo. 326; Dearmond v. Dearmond, 10 Ind. 191–195; Wailson v. Cassidy, 2 Ind. 562; 2 Bl. Com. 296; Mitchell on Real Est. 225, 403, 412, 413; Stearn's Real Actions, 2; Morris v. Stephens, 46 Pa. 200–203; Com. Dig., "Fait," A. 4; Mills v. Gore, 20 Pick. 28–36; Duraind's Ap., 116 Pa. 93; Boardman v. Dean, 34 Pa. 252; Galbraith v. Zimmerman, 100 Pa. 374; Critchfield v. Critchfield, 24 Pa. 100; Thompson v. Lloyd, 49 Pa. 127; Lutes v. Reed, 138 Pa. 193.

*W. B. Broomall,* for appellee, cited, on the question of delivery: Blight v. Schenck, 10 Pa. 285; Critchfield v. Critchfield, 24 Pa. 100; Pa. Co. v. Dovey, 64 Pa. 260; Diehl v. Emig, 65 Pa. 320; Stephens v. Rinehart, 72 Pa. 434.

Declarations of a grantor made subsequent to the execution of a deed are incompetent: Chess v. Chess, 1 P. & W. 32; Ingles v. Ingles, 150 Pa. 397.

OPINION BY MR. JUSTICE GREEN, July 11, 1894:

The deed under which the defendant claims title to the land in controversy, is an absolute deed in fee simple from Andrew Boyd Cummings to Alexander F. Glass. It is dated March 30, 1866, and it was duly acknowledged the same day before a notary public. The signature of the grantor was attested by the signatures of two witnesses, and the execution of the deed was fully proved. Besides the recital of the payment of the

purchase money contained in the deed, a receipt for the purchase money at the foot of the deed was signed and sealed by the grantor, and this signature was also attested by the same two witnesses who attested the deed.  If this deed was delivered, the grantor's title was certainly and absolutely divested, and the plaintiffs have no case.  To this effect the learned court below charged the jury with entire correctness.  The whole controversy before the jury turned upon the one question of delivery, and the jury was so clearly and frequently instructed upon this subject that there can be no question that they fully understood precisely what they were to decide.  The question of delivery was, of course, a question of pure fact which the jury alone could decide.  They rendered a verdict in favor of the defendant and therefore decided that the deed was delivered and the title of the grantor divested.

Unless the plaintiffs' contention that there was no sufficient evidence of delivery to justify the court in submitting that question to the jury can be sustained, the judgment should be affirmed.  There are numerous assignments of error, many of which are quite unimportant, and a considerable number may be grouped together in considering them.

The chief reason for questioning the fact of delivery was that the deed from Cummings to Glass was found, after his death, in a safe in which Cummings kept certain papers belonging to him.  Much of the force which might otherwise be attributed to this fact is taken away by the circumstances surrounding it.  This safe was kept at the house 910 Pine street, which belonged to Mrs. Glass, and in which she and her family lived when in the city.  The safe was used for years in common by Mrs. Glass and Mr. Cummings, each of them having a key to open it.  Mr. Cummings lost his key and used the one belonging to Mrs. Glass for some years before his death.  Mrs. Buehler, a married daughter of Mrs. Glass, and a member of her family for many years, had the actual custody of the key belonging to her mother.  Mrs. Buehler died in 1883, and after that, until the death of Mr. Cummings in 1891, this key was kept by Miss Catharine Ubil, who was also a member of the family from 1875, to and beyond the time of Mr. Cummings's death, except for a period of about sixteen or eighteen months from the spring of 1883 to the autumn of 1884.  Miss Ubil received

the key from Mrs. Buehler shortly before her death and retained it continuously thereafter. During the life of Mrs. Buehler the safe key was kept in a small iron box in a drawer in the room of Mrs. Buehler, and the key of the iron box was kept by Mrs. Buehler during her life, and by Miss Ubil after her death. This box contained articles of jewelry, money and private papers belonging to Mrs. Glass, and it cannot be questioned under the evidence that Mrs. Glass had, at all times, free and unobstructed access to the safe in which the deed was ultimately found. At the time it was found the safe contained two bundles of papers, one containing the title papers to the premises No. 1626 North 15th street, Philadelphia, which belonged to Mr. Cummings, and the other containing the title papers to the Linwood property, the one now in controversy, and in this last bundle, and as part of it, was the deed now in question. There was a rubber band around the whole of the two bundles, and the person who opened the safe in the presence of Mrs. Glass, a Mr. Fiss, agent of the executor corporation, testified that there was nothing in the safe except these two bundles. It was in evidence that Mrs. Glass had other valuables and papers elsewhere, and that Mr. Cummings had large amounts of securities and papers at other places. It is apparent, therefore, that no very serious inference of an exclusive possession, on the part of Mr. Cummings, of the deed in question, was to be derived from the circumstance that it was found in such a place of deposit as this.

But the defendant gave evidence to prove that, such as it was, the possession thus maintained, was derived from her, for the purpose of custody for her, and for her benefit; and in the same connection evidence also was given, that the deed was in the exclusive possession of Mrs. Glass, and, by probable inference, in the possession of Mr. Glass, before the death of Mrs. Buehler, and a number of years before the death of Mr. Cummings.

Miss Ubil testified that she entered the family as a dressmaker in the year 1875, and remained there as a member of the family, with the brief interruption before mentioned, until after the death of Mr. Cummings. She testified that after the death of Mr. Glass, Mrs. Buehler, his daughter, took charge of the business papers of the family, and that she kept quite a

number of papers in a certain box which, she said, was kept when the family were at Linwood, "in the second bureau drawer in Mrs. Buehler's room, in her bedroom," and when in Philadelphia, "in the wardrobe in the second story front room, Mrs. Buehler's room."

She also testified that on one occasion Mrs. Buehler sent her to the box to get some money, and said, "I put my hand in to get the money, and in drawing my hand out with the money my sleeve drew a deed out." After saying that Mrs. Buehler was in the room at the time, she was asked: "Q. What did you notice about the deed? A. I knew it to be a deed. Q. Did you know from whom to whom? A. Yes, sir; from A. Boyd Cummings to Alexander F. Glass. Q. How did you know that; by seeing it or hearing something? A. By seeing it. . . . . Q. What became of the deed then after that? A. I put it back in the box. Q. Was anybody else present? A. No one but Mrs. Buehler and myself." She was then shown the deed in question, and was asked: "Q. Did you ever see that deed? A. Yes, sir. Q. When was it? A. During the summer of 1881 or 1882. Q. Where? A. I took it out of this box at Linwood. Q. That is the paper? A. That is the paper. Q. What was done with it after you took it? A. I put it back."

Of course, upon the foregoing testimony, it was a justifiable inference that Mrs. Buehler, having taken charge of her father's papers after his death, received this deed as a part of those papers. The mouths of both her father and herself are closed by death, but the natural inference that a man has the custody and control of his own papers during his life, is entirely appropriate to the occasion, and would be quite sufficient to justify the jury in adopting it in this instance, and if the jury believed the witness, and there is no reason, apparent or suggested, why they should not believe her, they may readily have found that Mr. Glass had possession of this deed in his lifetime and at the time of his death, and that his daughter received it as one of his valuable papers. Upon that inference there would be an end of this case, as the fact of delivery to the grantee would be naturally, almost necessarily, inferred from the grantee's possession of the deed long after the time of its execution. On the testimony of this witness alone the ver-

dict of the jury can be readily sustained. She was entirely disinterested, not contradicted in the slightest particular, and altogether unimpeached. There is really no room in her testimony for any inference that the deed was received by Mrs. Buehler, from any other source than from Mr. Glass, as one of his papers which came into her possession after his death. If it had been delivered to Mrs. Glass by Mr. Cummings there was no reason why it should not remain in her custody, as she was still living. There was not a shadow of testimony that it was delivered by Mr. Cummings to Mrs. Buehler, and the next incident in the testimony distinctly proves that no such theory can be entertained.

For the witness next proceeds to detail the action of Mrs. Buehler when she was about to die, and this statement easily and naturally accounts for the circumstance that the deed was found in a safe in which Mr. Cummings kept some of his papers. The witness testified that on the 18th of May, 1883, which was Friday, before the following Monday on which she died, an interview took place between Mrs. Buehler and Mr. Cummings in the presence of the witness, in the bedroom of Mrs. Glass at her home, 910 Pine street, Philadelphia. What took place is thus described : " Mr. Cummings came into the room and Mrs. Buehler commenced to talk to him about her mother's business affairs and the papers. She asked Mr. Cummings to look after her mother and daughter, and she asked him to look after all the papers and attend to the business of the family ; as Mr. Cummings had charge of some of the affairs, she gave him charge of the rest, and he promised her he would ; he said you need not fear for your mother ; after that she was rolled back into the second story back room in a rolling chair. . . . . And we went to the locked drawer and she showed me how to open this drawer, and from it we took a brown package of papers with a rubber band on it, and she asked me to give it to Mr. Cummings ; I took them into the second story front room and handed them to Mr. Cummings and told him, 'there are the papers that Mrs. Buehler sent in,' and he took them and left the room. Q. Can you say whether or not you ever saw that package of papers afterwards? A. Yes, sir, several times. Q. Where ? A. In the large safe. Q. At Pine street ? A. Yes, sir. Q. Can you say covering what length of time ? A. Be-

tween that time and up to four years, three or four years before Mr. Cummings's death. Q. What uses was that safe put to ? A. To keep papers and jewelry in for the family, and also Mr. Cummings ; we all used it. Q. The family and Mr. Cummings both used it, did they ? A. Yes, sir. Q. When did that use of it first commence ? A. I don't know ; my earliest recollection of it is that it was used that way. . . . Q. Do I understand you to say that that use of the safe continued from your earliest acquaintance with it down to within three or four years of his death ? A. Yes, sir."

On cross-examination the witness testified : " Q. Did I understand you to say that you had a key of the large safe at 910 Pine street? A. Yes, sir. Q. When did you get that? A. Friday morning before Mrs. Buehler died. Q. And the same day that you have testified that an interview took place with Mr. Cummings ? A. Yes, sir. Q. And you kept that until after the death of Mr. Cummings. A. Yes, sir. Q. Who else had a key during that period ? A. Mr. Cummings. Q. And these were the only keys you knew of ? A. The only keys I knew of. Q. You stated that there were things belonging to the Glass family kept in that safe, as I understand ? A. Yes, sir. Q. What kind of things ? A. Papers and jewelry. Q. What papers did you ever see there ? A. I saw the deed to the Pine street house was there and there were other papers there ; I can't remember, I can't recollect that ; but there was jewelry kept there by all the family. . . . Q. You left in 1883 ; it must have been immediately after Mrs. Buehler's death ? A. It was. Q. Just after you got the key then ? A. A short time after, yes, sir. Q. What was done with the key then ; you went away ? A. I had charge of the key ; it was kept in this box (indicating) and I had charge of the key to this box. Q. Don't you mean you had the key that was to that box ? A. I hadn't it always with me ; I had charge of it ; I had it locked up. Q. I understand that into this box you put the key to the fire-proof ? A. Yes, sir. Q. And you locked this box ? A. Yes, sir. Q. And sometimes you had the key to this box ? A. No ; I always had the key to this box."

Being further interrogated upon cross-examination, in reference to the package of papers, handed by her to Mr. Cummings, she testified as follows : " Q. Did you examine the

package of papers when you took it in the month of May, 1883, from the front room to the back room? A. No, sir. Q. Did you ever open it? A. No, sir. Q. Would you say, after the years that followed, you saw that package of papers in the safe; are you perfectly sure it was that package of papers? A. Yes, sir. Q. Was there anything else with it? A. When I saw it? Q. In the safe afterwards? A. Please ask that question again. Q. When you saw the package of papers which you say was the package that Mrs. Buehler had given you to carry to Mr. Cummings, in a subsequent year and in the fire-proof, are you sure or not there was nothing with them? A. No; I didn't notice whether there was or not. Q. It still had the gum band around it? A. Yes, sir. Q. Do you know whether it is the same gum band? A. No, sir. Q. Do you know whether the gum band that was around it passed around any thing but the package you saw in 1883? A. No, sir. Q. And yet you know it is the same package? A. It is the same package or one exactly like it. I know the package. Q. You know its size? A. Yes, sir; I recognized it always here before. Q. Did Mr. Cummings ever borrow the key that you had of the Pine street safe? A. Yes, sir. Q. Often? A. He has on several occasions. Q. When was the last time? A. Within a couple of years of his death."

It will not be necessary to pursue the citations of testimony further. It was only desirable to do so in order to determine intelligently whether there was evidence sufficient to sustain the verdict, and therefore sufficient to warrant the court in leaving the question of delivery to the jury. It is only necessary to add that, in our opinion, after careful examination of the evidence, and of the entire argument of the learned counsel for the appellants, it would have been the gravest error to withdraw the case from the jury. Furthermore we consider that not only was it proper to submit the question to the jury, but that their verdict was abundantly justified by the evidence, and that any other verdict would have been contrary to the weight of the evidence, and to the manifest justice of the case. We cannot conceive that there could be any higher or stronger evidence of an intent on the part of Mr. Cummings to convey this land to Mr. Glass than the fact that he caused to be prepared, and duly and deliberately executed, in the presence of

attesting witnesses, a solemn deed for the same which he duly acknowledged before a proper officer. There would be nothing to question the full legal efficacy of this deed if it had not chanced to be found in a safe in which Mr. Cummings kept some of his papers. But that circumstance, which is in no case conclusive, is of the most feeble significance when considered in the light of the testimony. The safe was at no time in the exclusive occupancy of Cummings, and was at all times used as well by the Glass family, who always held a key to open and lock it. It was a receptacle and depository, as well of the papers and valuables of the Glass family, as of Cummings, and was constantly used as such. For several years before the death of Cummings he had no key to the safe, and when he wished access to it he was obliged to borrow the key of the Glass family. It is obvious therefore that the mere presence of the Glass deed in the safe afforded no inference of any weight worth considering, that the deed was in the exclusive possession of Cummings. Its deposit there was entirely consistent with its possession by Mr. or Mrs. Glass. So much for the inferences which arose simply from the bare fact of its presence in the safe, illustrated only by proof of its use, its custody and its locality, which was in the home of Mrs. Glass. But, in the light of the testimony of Miss Ubil, who distinctly and positively testifies that she saw it in 1881 in the small box of Mrs. Glass, with which Cummings had nothing to do, and in which nothing of his was kept, that this was ten years before the death of Cummings, that it was after the death of Glass, whose papers were taken in charge by his daughter, Mrs. Buehler, there is no place anywhere in the case for an inference that the deed had never left the possession of Cummings and therefore had never been delivered to Glass. The non-delivery theory has, at the very best, nothing but an inference to support it. When the basis of the inference is removed the theory is destitute of all support.

It will readily be seen that when the package of papers was delivered by Miss Ubil to Mr. Cummings, a fact had transpired which entirely accounted for the presence of the deed in the safe even if the safe had been in the exclusive occupancy of Cummings. For although Miss Ubil did not examine the individual papers contained in the package, and therefore could

not say positively that the deed was there at that time, yet she did absolutely identify the package. When the deed was found it was in that package, and the inference is most natural, indeed almost conclusive, that it was there when she delivered the package.

All of this testimony was for the jury and they have found that the deed was delivered. The testimony being in our opinion amply sufficient to sustain the verdict, the fact must be considered as established. There was other corroborative testimony but it is not necessary to consider it. So far as possession of the property is concerned, it was entirely undisputed that the Glass family occupied it every summer after the purchase. Mr. Cummings was with them most but not all the time. The contention that because he paid the taxes, insurance, mortgage money and perhaps other expenses, he was the owner, is only of the slightest value against the absolute deed. In no point of view could such payments revest the title in Cummings. He was an old man, a bachelor, a man of wealth, he resided with the family of his own choice, because it pleased him to do so, and, judging from the expressions in his will, he considered himself as under obligations to them for long continued acts of kindness and attention. If he chose to relieve the family of the burden of these payments he had a perfect right to do so, and none could question his pleasure in that regard. The payments are as consistent with that theory as with the theory that they were made in the exercise of ownership. Moreover there was evidence that he had in his possession considerable money belonging to Mrs. Glass for some of which he had given her his note. The life insurance money which she received on the death of her husband was placed with him. The stubs of his check books show that he owed her money for which he paid her interest and also other sums from time to time. It is impossible to say whether he used any of her money in paying taxes, insurance and other expenses, but it is also impossible to say he did not.

The check books were clearly admissible in evidence, and there is no merit in the first assignment. We cannot possibly see why it was not competent to show who paid the house expenses at Linwood and therefore dismiss the second assignment. The omission of Mr. Cummings to speak of Linwood when he

was discussing with his old friend, John Baird, the details of his will, was a slight circumstance indicating that he did not consider it his, and hence was admissible. to the jury, and we dismiss the third assignment. The same is true of the declaration of Cummings to Baird of his intention to destroy useless papers. Certainly if he had never delivered the deed to Glass, and never intended to do so, it was a useless paper only calculated to breed litigation, and he would naturally have destroyed it, and therefore the fourth assignment is dismissed. We see no reason to reject the declaration of Mr. Cummings to his niece Mary Cummings. It showed his kindly regard for Mrs. Glass and her family and his intention to help and assist them in any way he could and would easily explain such facts as voluntary payments on their account. We therefore dismiss the fifth assignment. The fact testified to by William H. Priest was an act of ownership by A. F. Glass and was therefore admissible and we dismiss the sixth assignment. The seventh and eighth assignments are rejected, because the placing of the furniture of Mr. and Mrs. Glass in the house at Linwood was an act consistent with a claim of ownership by them, and the furnishing of the money of Mrs. Glass to Mr. Cummings by way of loan was a competent fact as we have said before. It is not so clear that the bonds mentioned in the ninth assignment were competent, but as the money relations, between Mr. and Mrs. Glass on the one hand and Mr. Cummings on the other, had become involved in the case, we cannot say it was clear error to receive them. The testimony was of the most trivial character and we certainly would not reverse even if its admission was erroneous. Of course the deed from Cummings to Glass was competent evidence and we reject the tenth assignment.

The remaining assignments are to the charge of the court and the answers to points. We have carefully examined them all and we do not consider there is error in any of them. The court was particularly careful in stating the law in regard to the various modes in which delivery might be made, and, we think, was entirely correct in what was said as to all of them. It was not said by the court that the deed might have been delivered after Mr. Cummings's death, but that proposition was denied. We attach but little consequence as to what was said

in regard to other modes of delivery than directly to Mr. Glass, because in our judgment the facts indicate that the deed was delivered to him, and the evidence is entirely sufficient to sustain that theory. We do not think the thirteenth assignment is material. The idea the court meant to convey was, "that the great question will be was the deed delivered during the lifetime of Mr. Glass," as is indicated by the testimony of Miss Ubil, and in that sense the remark was entirely correct. The jury could not have been misled because their question to the court shows that they understood that the deed was in the hands of Miss Ubil during the life of Mrs. Buehler, and they wished to know whether that could be considered as a delivery to the Glass family. The court said in reply it was *evidence* of delivery to the family and if unexplained it would be sufficient, but that the whole evidence was for them, and added, "If there is any other evidence in the case that would tend to explain that delivery you may consider it." The court did not say, and the jury certainly did not understand, that Miss Ubil had testified that Mr. Cummings had actually delivered the deed to Mr. Glass. The want of accuracy in the language of the court did no harm and we would not reverse for such a cause.

Judgment affirmed.